Ladies and gentlemen, we have one case on the call. The time allotted for argument will be 15 minutes for the up-and-walk, 15 minutes for the up-and-lead, 5 minutes in rebuttal. I don't use the time in lights, but I will hold you to the time, so watch the clock. People, please report in the room. Good morning, Your Honors. My name is Joseph Van Arck of the Office of the State Appellate Defender, and I'm here on behalf of my client, Corsetti Brand. Brand has raised six issues on appeal. The State has conceded that, as to Issue 3, this case should be remanded for a crankle hearing. Of the remaining issues, I intend to address the first, concerning the admissibility of certain Facebook messages, but I'm happy to answer any questions or address any concerns that Your Honors may have regarding the other issues. I anticipate that my opening will be around 10 minutes, and I would like to reserve a few minutes for rebuttal. You can get 15 minutes, but you'll get 5 minutes for rebuttal. Thank you, Your Honor. At trial, the court allowed the State to present evidence regarding two Facebook messages that the complainant alleged were sent by Brand. One of the messages was allegedly sent on November 8th, and the other was allegedly sent on November 21st. According to the complainant, the November 8th message told her where she could find her car, which she claimed had been stolen during the incident at her apartment on November 3rd. A screenshot of that message was not entered into evidence because the complainant claimed, without corroboration, that she had deleted it due to her Facebook messenger inbox being full. The November 21st message contained threats against the complainant and her family. According to the complainant, the message listed street numbers where her relatives lived. A screenshot of that message was entered into evidence. These messages were not properly authenticated and should not have been admitted into evidence. Under the Illinois Rule of Evidence, the State was required to present evidence sufficient to establish that the Facebook messages were, in fact, sent by Brand. The State failed to do so. The only evidence that these messages were sent by Brand came from the complainant. According to the complainant, the messages were sent by an account with the name of Missetti Meech, which is the name that the complainant claimed Brand went by on Facebook. This testimony was, by itself, insufficient to authenticate the messages. Why? Because of the risk of social media. As the 2nd District noted in Kent, which is the only Illinois case to squarely address this issue, the authentication of social media poses unique difficulties in terms of authentication. Social media accounts are particularly vulnerable to manipulation. Well, let's give you the fact that you can impersonate someone and open a Facebook account under the name of, you know, Franklin Roosevelt or Ariana Grande or whoever you might want to impersonate. But there's a lot more than that here, isn't there? Because you not only have the specific fake name he used in the boyfriend-girlfriend relationship, but you also have the identifications of the streets on which all the family members live and then the location of her own car by address, right? Correct. Isn't there enough circumstantial evidence to get us around the problems that you complain of? No, Your Honor. Starting with the November 8th message, that is what the State argues, is that they know this was authenticated because Brand, as the person who took the car, would be the one who would know where it was located. But this is the same argument that the State made in Kent and that the Court rejected, noting that it was circular. In Kent, the State argued, the defendant in Kent was accused of shooting a man and leaving him for dead in a driveway. The Facebook posted issue in Kent, which allegedly came from the defendant's account, said, it's my way or the highway, leave him dead in his driveway. And there the State argued that that was authenticated by the fact that the defendant was accused of shooting a man and leaving him to die in his driveway. We've got the victim here who says she knows he uses this social media name. It's not a guess anymore. It's not merely a circular argument that because he knew where the car was, it must have been the one who drafted it. Her testimony is she knows he uses this name. Correct, Your Honor, but that's only one part of it. It's not just enough that this is... I understand that. Usually, circumstantial evidence is not one part. It's a lot of little parts that add up and make a whole. So take it all and tell us why, if all of that is true, why that's not enough. Well, because of how he – because – so she knows – she says that this is the account that he sent her messages from before. But she doesn't know that he sent these particular messages because of the possibility that somebody else could have accessed his account. That is what the court was concerned with in Kent, and that is what courts around the country have been concerned with, because it is – as the court noted in Kent, it's very easy to access somebody else's account. Almost anyone – as the court said, almost anyone can create a fictitious account and masquerade under another person's name, or they can gain access to another person's account by obtaining their username and password. So somebody else could have accessed Baran's account in this case if he had forgotten to log out of his account. If he had – Facebook, there's an option where you can choose to stay signed in, so that any device where you click that option, any person who uses that device after you, as long as they know your username, they can then access that account. If Baran had given out his password to anybody in the past, or even if he had just set up a very easy-to-guess password – I mean, a lot of people use things like 1-2-3-4-5-6. It wouldn't take somebody long to figure out that account. So just the complainant's testimony that he's sent these messages from this account in the past, it doesn't take into consideration those concerns that were at present in Kent and that are very much present in this case that somebody masquerading or impersonating Baran could have accessed that account. I mean, in Kent, the statement about the driveway, the court didn't find to be significant in that it was – that type of fact was kind of well-known publicly because of the police investigation, which is far different than telling the victim where the car was. I mean, it wasn't a well-publicized event. Correct, Your Honor. But the course of the court's position in Kent in rejecting that argument by the state was that, you know, to the extent that the information about the driveway shooting was obscure, it would be known by the offender, not necessarily by the defendant. So that's where the circular aspect comes in because the state is saying, well, we know that he did this because of the Facebook message, and how do we know he sent the Facebook message? Well, because he did it. It can't be used for both purposes is what the – was the crux of the Kent court's position in that regard. And here, as to, you know, the information being known by a lot of people, I think that there's a reason to believe that we have that in this case, too. The defendant – the complainant and Baran, they had a very acrimonious relationship. There was a lot of – you know, she had an order of protection against them. And these are the kind of things that people talk about. And so you have a situation where anybody who is sympathetic to the complainant or possibly holds a grudge against Baran, you know, would have a motive, then, to send these messages. Can you restate the basis for an objection to the admission of this evidence at trial? And would – did defense counsel? Yes. Yes.  And what about the other messages? There was – for the November 8th message, she did not state a basis. They were introduced basically right after each other, though, on the record. So your opponent's going to stand up here and say it's forfeit because you didn't state a basis during the objection to the November 8th message, nor did you state a basis in the post-trial morphing. Correct, Your Honor. But the focus of the forfeiture was to ensure that the court had an opportunity to review the same essential claim that was later raised on appeal. And here, I think by objecting on the basis of relevance and foundation to the November 21st message, the court was sufficiently apprised of what the basis of counsel's objection was. Counsel was saying that we don't know that these messages are sent by Baran, and that issue was presented to the court, and the court had the opportunity to consider that and then to rule on that. Mr. Beck, your client was convicted of aggravated domestic battery, home invasion, and possession of a stolen motor vehicle. Let's take the first two, the domestic battery and home invasion. Why isn't – why aren't the Facebook messages harmless error as to at least those two? Well, because as – I mean, they really don't – they have no – little probative value as to those two because it's based on her testimony as to what he did in her presence. Correct. But it – as the State asserted, you know, if – assuming Baran did send these November 21st messages, the State asserted during closing argument that that would then be an admission of guilt. And as the court – as the trial court noted, the issue here is entirely one of credibility. So by admitting the November 21st message, you know, where he's – who's making these threats, the State is thereby corroborating the complainant's testimony and therefore bolstering her credibility in the eyes of the court. I mean, I think it's incredibly probative of – if, you know, if Baran sent this message, I think it's incredibly probative of whether or not he, in fact, committed the home invasion and the aggravated domestic battery. And so in Peabody Kent, the Kent court listed six factors that are relevant for authenticating social media posts. One is that the purported sender admits authorship. That's not present in this case. We don't have that. The second is that the purported sender is seen composing the communication. Again, that's not present in this case either. The third is business records of an internet service provider or cell phone company that show that the communication originated from a computer or a cell phone controlled by the defendant and under circumstances in which it's reasonable to believe that only he would have had access to the device at that time. And the state didn't present any such evidence in this case. In fact, we don't even know if the messages were sent from a computer or a cell phone, which is significant because it bears on the issue of how easily someone could have accessed this. If it's a desktop, then anybody who, you know, uses that computer after a brand could have had access to this – to his Facebook account. The fourth is the communication contains information that only the purported sender could be expected to know. As already discussed, you know, the addresses of her relatives, this is – like I said, this is a very volatile relationship. Any – you know, there's just no basis for the state's claim that only, you know, this information was only known to a handful of people. Anybody could get this information from the phone book or, ironically, even from Facebook. Another one is the purported sender responds to an exchange in such a way as to indicate that he was the person accepted. And here we don't have that. And I think that's really critical because we just had that screenshot of the November 21st message. We don't know anything else that was said between the two accounts either before or after that message was sent. So there's no context from which we can discern whether, you know, who sent these messages. And the last method is, you know, other circumstances peculiar – particular to the case that may suffice to establish a prima facie showing of authenticity. And here the state hasn't pointed to any circumstances that would justify the admission of the message based on the testimony of one witness. Not only that, but the state hasn't identified any case from any jurisdiction where the testimony of a single witness was sufficient to authenticate a social media post or message. Therefore, none of the factors apply. And accordingly, because of the very real potential for social media accounts to be subject to unauthorized access, the complaint testimony was insufficient to establish either that Brandt controlled the account or that even if he did, that he sent the messages in question. And if Your Honors have no further questions, I will reserve the rest of my time for rebuttal. Thank you, Steve. May it please the Court. Dan Pivovarczyk on behalf of the people. I will also confine myself to the first issue, however, if Your Honors have any questions concerning any of the other issues in the brief, I would be happy to respond to those as well. With regard to issue one, there absolutely was no error in the determination on the requirement of authentication. But before I get to that, I'd like to address two forfeiture and harmless error issues that were briefly discussed before, Your Honors. There was nothing brought up to this judge at the trial level about not signing in and saving the sign-in stuff so someone else could use a password. There was nothing presented about higher suspicion for social media evidence. The only thing the objector would have to say is objection foundation. He wouldn't have to tell the judge what was missing. That's for the judge to determine. That's absolutely true, Your Honor. And my point is that the court in this case wasn't given the opportunity to rule on the arguments that are now being presented. Well, did they object? Did they object based on foundation to the November 20th or 21st email? To the first one or the second one? Second. With regard to the second one, I believe they did object to foundation. They did. Okay. So what more do they have to say? I'm not saying that that was insufficient in order to satisfy the bare minimum of preserving that issue during the trial. What I'm saying is that what you have here is a brand-new argument being presented to the appellate court about social media evidence where the victim's testimony about this was unrebutted and uncontested, and there were no arguments presented about that. If he objects based on foundation, isn't he entitled to argue on appeal anything that goes to foundation or lack thereof? And that's fine, Your Honor. And there was no error here. But these are – I can understand there was no error argument. But what I'm trying to find out is where do you say that he forfeited as to the second email? As to the second, there isn't any basis stated in the post-trial motion. There isn't any basis stated to that objection in the oral argument on the post-trial motion. So I believe in our brief, that was the basis for arguing forfeiture as to the second one. But as to that second message, I'd like to transition to the question about harmless error that Justice DeWart asked. And that has to do with the domestic battery and the home invasion charges and the argument regarding how that would not be harmless error. And opposing counsel appears to rely entirely on a relatively brief reference to that second message in the closing argument. But it's important to keep in mind that during the judge's ruling finding the defendant guilty, he never relies on that second message for anything with regard to those home invasion and domestic battery charges that's not referenced at all in his ruling or in his subsequent rulings addressing the issues of the sufficiency of the evidence in the post-trial motions. So the people's argument would be certainly that with regard to those convictions, there's absolutely no basis to argue that he was prejudiced by the admission of these statements. As to the- Why was this evidence put in? What was the purpose for the evidence in the first place? With regard to the first message, it was sent five days after the defendant took the victim's vehicle. And that message told the victim where to find her van. So that was a message that, number one, was clearly sent by the defendant. It was information that only the defendant had possession of. And it absolutely went to the proving of the possession of the stolen motor vehicle element because it absolutely corroborated what the victim's testimony was, what the victim's 15-year-old son's testimony was. With regard to the second communication, it was sent 18 days after the victim was home invaded by the defendant. And the threats did echo the conduct that the defendant displayed during the home invasion, and it contained numbers corresponding to the addresses of the victim's loved ones. So what that amounts to is information that was known by a small group of people, including the defendant. There aren't a tremendous number of people for whom the addresses of the victim's loved ones are relevant information. The defendant was certainly one of those people, and the fact that he included that in this threatening message definitely weighs in favor of satisfying the requirement of authentication. The analogous case here is not People v. Kent. It's People v. Downing, which is a case that the defendant cites. And it's absolutely on point here because Kent, in fact, the lion's share of the defendant's other case law, involved investigators searching out potentially incriminating public posts and then using superficial similarities to connect those posts to the defendant in the case. In contrast, Downing, just like in the case of Barr, involved a victim with a close personal relationship to the defendant who authenticated messages sent directly to them by the defendant through an established channel of communication. In People v. Downing, that channel of communication was email. In this case, it was Facebook Messenger, but the trial court in this case correctly recognized that Facebook Messenger was the equivalent of email or text messaging. So these differences between Downing and Kent show why the authentication in Downing was affirmed and why it should be affirmed in the case of Barr. First, in Kent, there was literally no evidence that the defendant even used social media at all. The only connection between that public post that was put into evidence and the defendant were superficial similarities between the defendant's name and the name on the profile and the defendant's appearance and the picture on the profile. That's not what you have in Downing and that's not what you have in the case of Barr because in both of those cases, you have the victim having personal knowledge of the defendant's previous social media use using a specific profile on a specific platform. In Downing, that was NickD at Galesburg.net, and in the case of Barr, it was Missetti Meech on Facebook. The second difference between Downing and Kent is that in Downing and the case of Barr, the trial court applied the appropriate standard to this social media evidence, and that was the same authentication requirement that's required of all documentation. Whereas in Kent, they applied a lower standard to this social media evidence than would have been applied to traditional documents. The Kent court said that if that post in Kent had instead been a flyer found on the street, it would not have been admitted into evidence because the circumstances would not have allowed it to be sufficiently authenticated to satisfy that requirement. But because it was found on the Internet by an investigator instead of found at the court, as a flyer on the street by the investigator, it was allowed into evidence. That's not what you have in Downing, and that's not what you have in the case of Barr, because in both of those cases, the trial court understood what the evidence was, and it applied the same standard as it would to any other evidence. And that actually fits perfectly with the Kent decision, because while opposing counsels write that Kent did express and echo the concerns of other courts across the country about the possibility of unreliability in social media evidence, it didn't impose a higher standard on social media evidence than any other kind of documentation. There are examples cited in the defendant's brief and cited in Kent of cases where a higher standard is imposed on social media evidence than any other kind of evidence. But the peril of that approach is perfectly demonstrated by two Maryland Supreme Court cases that the defendant cites two. Those are Griffin and Sublett, because you have in Griffin in 2011 the Maryland Supreme Court imposing a higher standard on evidence that's social media-related and essentially requiring somebody has to actually have seen the person typing this message into Facebook or you have somebody from Facebook putting it straight by an IP address to the defendant's computer. And if it's not that, under Griffin, it wasn't going to be admissible. But then you have Sublett in 2015, and the Maryland Supreme Court has to walk that back. The dissent in Griffin in 2011 becomes the majority opinion in 2015, and that majority opinion is the same thing that Griffin – excuse me – that majority opinion in 2015, just like the dissent in Griffin in 2011, is the same approach that Kent took, which is recognizing that all documents, regardless of whether they're social media or a handwritten letter or a telegraph message sent 100 years ago, have the same requirements for authentication, and that is that there has to be sufficient proof for a reasonable juror to find in favor of authenticity. Let me segue out to a different issue, Mr. Petervarchuk, on the vehicle. Yes, Your Honor. Since the defendant returned the car so quickly, how can we say that he permanently intended to deprive the victim of her vehicle on a permanent basis? I extremely disagree with characterizing that as so quickly. This was five days later, so he kept the victim's vehicle for five days, and in the realm of possession of a stolen motor vehicle, that is a tremendous amount of time. A case cited by the defendant in his reply brief, People v. Paschall, the defendant took the victim's vehicle and only had possession of it for 15 minutes, and the court still found that intent to permanently deprive had been formed during that brief possession. So five days is a tremendous amount of time. It's also important to keep in mind that intent to permanently deprive just needs to exist at some point. During the defendant's possession of the victim's vehicle, it doesn't have to exist throughout. So the fact that the defendant changed his mind at some point in time and then decided to tell the victim where the car was doesn't change the possession of a stolen motor vehicle he already committed. It's axiomatic that restitution does not negate the crime of theft. So in this case, with the defendant telling the victim where to find her car five days later, it doesn't negate the crime of possession of a stolen motor vehicle. It's relevant, it's a relevant fact for the trier of fact to consider when determining whether or not there was intent to permanently deprive, but it's not dispositive as the defense suggests. And in this case, the trier of fact was absolutely entitled to and entirely reasonable to give very little weight to that fact that he told her where the car was five days later. And there's a couple of reasons for that. To be clear, the people's argument is that it was shown that he intended to permanently deprive the victim of that vehicle at the time of the original forcible taking of the vehicle. The defendant took the van, keep in mind, the defendant took the van during a violent home invasion of an ex-girlfriend. And at that time, the defendant was so furious at the victim for breaking up with him that he forced his way into her apartment while she was making dinner and helping her kids with their homework. Forced his way into her apartment, it strangled her in front of her children. Obviously, that's also sufficient motive for him to steal her car. He took the keys from that apartment that he had forced his way into, strangled her, and drove off with her car and kept it for five days. The motive here, as I said, was fury at being broken up with. She kept refusing to get back with him despite him being very intent on that. And he took that vehicle intending to permanently deprive her of it. The fact that he kept it for five days shows how long it took him to realize or to decide to finally tell her where it is. And even then, he didn't give her back the keys. Normal people returning a car give back the keys. He sent her a Facebook message saying where she could find the car. Unfortunately, she had a spare key and she was able to retrieve it. But he never gave her back the keys. And those keys are the mechanism by which he originally took control of this vehicle to begin with. He still had those keys on him three weeks later when he was arrested. And the fact that he never returned those keys, the original method for taking it, also is absolutely appropriate evidence to consider when deciding whether or not a reasonable finder of fact could have found that the defendant, viewing the evidence in the light most favorable to the people, that the defendant at some point during his possession of the victim's vehicle intended to permanently deprive her of it. But keep in mind, the defendant was not just charged with possession of a stolen motor vehicle. He was also charged with possession of a converted motor vehicle. And possession of a converted motor vehicle does not require intent to permanently deprive. Theft and conversion are both unlawful appropriations of a mother's property. But theft requires intent to permanently deprive. And conversion does not. These definitions are indisputable. You have the IKI definitions of stolen property and converted property, which makes this distinction indisputable. The line of case law before this Court, including Gengler and Bivens and Washington, also makes it indisputable that walk the bed intent to permanently deprive is not a requirement of conversion. When somebody temporarily converts another's vehicle to their own use, they commit a conversion but not a theft. So joyriding is the perfect example of a wrongful conversion. Gengler, cited in the People's Brief, is absolutely on point with regard to this issue because that case held that the intent to permanently deprive was not an element of possession of a converted motor vehicle, regardless of whether the defendant was the original taker of that vehicle. In Gengler, the defendant and the victim had a fight in a gas station parking lot, and the defendant took the victim's vehicle. The defendant was only charged with possession of a converted motor vehicle, and the jury was not instructed in that case on the definition of theft, was not instructed on a requirement of intent to permanently deprive. And nonetheless, the Gengler Court affirmed the defendant's conviction for possession of a converted motor vehicle. And the Court stated that it was rejecting the defendant's claim that intent to permanently deprive was a required element of possession of a converted motor vehicle. So Gengler absolutely disproves the defendant's claim on this point. In his reply brief, he attempts to suggest that Gengler stands for the opposite of what it actually stands for and does that by quoting two sentences from Gengler. And I just wanted to briefly explain what Gengler was saying in those sentences, because Gengler stated that it applied the principles of COSARC, which is a possession of a stolen motor vehicle case, to conversion issues. And that doesn't mean that it was transferring the intent to permanently deprive requirement from PSMV to possession of a converted motor vehicle. What Gengler was saying is that in COSARC, a person can absolutely be convicted of possession of a stolen motor vehicle, even if they're the ones who committed the original theft of that vehicle, as long as the jury gets instructed on the definitions of theft and stolen property. Gengler applied that to conversion and said that a person can commit possession of a converted motor vehicle, even if they're the ones who originally did the conversion, but the jury has to be instructed on the definition of converted property. And that's what happened in Gengler. And that's why Gengler was affirmed. And if, in fact, there was a requirement of intent to permanently deprive in a possession of a converted motor vehicle case, then Gengler would not have been affirmed. It would have been reversed, because that wasn't part of the instructions. Counsel, your time has expired. For the reasons stated here and those in our brief, we ask you to affirm the defendant's convictions and sentence. Move on. Addressing the State's argument about harmless error and the Court never explicitly relying on the November 21st message, again, as the Court noted, this was about credibility. And as the State says, this November 21st message is probative. It's echoing the conduct from the night in question. So it's, therefore, enhancing the witness's credibility. It's bolstering her credibility. So even if he doesn't explicitly say you've got the November 21st message, you've got basically what the State says is an admission of guilt on the part of the defendant. So to argue that that doesn't affect the Court's thinking when the Court is thinking about credibility, I think, is not accurate. And then addressing the People v. Downen. There, there was an e-mail exchange between the victim and the defendant. But there, it was the victim was in the presence of a police officer, sending an e-mail to the defendant at an e-mail address he had previously used to communicate with her. Then she receives a reply back from that e-mail, which was responsive to her e-mail and contained information that the Court noted was exclusively known to her and the defendant. So there you have, Kent rejected a comparison with Downen because there you have responsive e-mails. You have contacts from which to determine who was sending these messages. And then you have information that is exclusively known to the defendant and the victim in that case. Addressing the State's points about the superficial similarities in Kent between the defendant and the Facebook post, we have his first name. We have his nickname included in this. And not only that, they say there's a picture resemblance. It's a profile picture of the defendant on the Facebook page. So to say that those are superficial similarities is, again, not accurate. And addressing the lower standard, higher standard argument that the State seems to be making, no, the Kent Court applied the correct standard. The standard is, and the standard is here, that the State has to show that the messages were sent by grant. But when making that determination, what the Kent Court was saying is you have to consider the medium. You have to consider the particular characteristics of the medium. So it's not a higher standard. The standard is the same, but you just have to look at the particular circumstances of the communication when making that determination. In regard to the permanently intent to deprive, the State recites the facts of this case and says that that somehow shows an intent to permanently deprive. I'm not really sure how anything that has to do with the choking or with the State's recitation of the facts, I'm not really sure how that establishes an intent to permanently deprive. And then in regard to the State's comments about Gellner and Pollard, Gellner very clearly spends, Gellner, they talk about Cozart, they talk about the intent to permanently deprive and about how that applies to stolen motor vehicles. And then they say we hold that these principles delineated in Cozart and its predecessors are also applicable in those cases in which a defendant is charged with possessing a converted motor vehicle and the individual is accused of committing the initial conversion. The reason that the defendant's conviction was affirmed in Cozart and in Gellner is because he raised a necessity defense. And according to the Court, as the Court put it, you know, there was the necessity, there was, in view of the defendant's admitted version of the incident, there's no possibility that the jury might reject his necessity defense and at the same time find that he did not intend a wrongful conversion. So that's a fact-specific inquiry. That has nothing to do about whether you have to show an intent to permanently deprive. And moreover, the State doesn't mention the case of Pollard's or the IPI instructions referenced in Pollard's. The IPI instructions for Illinois Penitentiary Instructions 23.36 direct that when a defendant is charged with possession of a stolen or converted vehicle and it is alleged or the evidence shows that the defendant participated in the actual taking of the vehicle, it may be necessary to include the phrase intent to permanently deprive in the instructions. And in Pollard's, the Court held that such an instruction is necessary where the State, by asserting that the defendant was responsible for the theft of the car, puts the defendant's mental issue, mental state at issue. And here the State did that. They're asserting that he is the one who stole the car. They're saying that he knows the car is stolen because he's the one who stole it. And under Cozart, and the case is cited in my brief, they were therefore required to prove an intent to permanently deprive, and they haven't done that. They haven't handed any instance here where, I mean, if you were following the State's line of reasoning, you could assume an intent to permanently deprive any time that there's a taking of a vehicle. And I don't think that Cozart or any of those other cases cited in my brief stand for that proposition. If Your Honors have no further questions, I would request that you reverse Grant's convictions and remain for a new trial. Counsel, thank you. The matter will be taken under advisement. The decision will issue. All right.